2009, 13, 12. Mr. Taylor. May it please the Court. Good morning, Your Honor. The District Court in this matter adopted defendants' theory of the case from the beginning and went on to credit defendants' incompetent evidence on their theory without any evidence. Without providing Astrazeneca an opportunity to discover evidence to contradict or explain defendants' theory. You did have some opportunity for discovery, did you not? We had a very limited opportunity for discovery. Limited but focused. The District Court obviously was quite aware of your concerns and your interests and the issue and at the same time wanted to move this matter along and focused your efforts on what she perceived things that mattered. What she perceived mattered, however, was shaped by defendants' unreasonably narrow theory of the case and which led the District Court to ignore the proper discovery that Astrazeneca sought both to contradict or explain defendants' theory and to develop evidence with regard to the theory of the case. Let's be very precise here. The District Court ordered them to provide you with a sample from their only sale ready batch, correct? That was the only sale ready batch they had. They also had various batches of salt but did you get samples of the various batches of salt or did you only get, I just want to be precise, did you only get a batch of the sale ready to test? We got a batch of what was characterized as sale ready by the Court. It was represented to be the single batch of formulated product that defendants said was in their possession. Then there were answers concerning 10 other batches, all of which showed less than 1% crystallinity and the Court says, but I still did not cut off discovery. To me there was a lot of opportunity. Actually we would disagree with that. The only evidence with regard to these alleged 10 additional batches was in an answer to an interrogatory provided by defendants. Is your view that AstraZeneca should have been given a sample from every of the 10 batches or simply that at a minimum Dr. Reddy's had to answer an interrogatory saying that the sample they gave was representative? What exactly is your position? It's actually more complicated than that. Our theory of the case, AstraZeneca's theory of the case, is that simply a final sample of the formulated product may not be sufficient in this case to end the inquiry as to whether the product infringes. Here's why. You think they have a highly crystalline formula at an intermediary stage and then they add alcohol and it becomes amorphous. You think there's 70% crystallinity somewhere during the process? We think that there is a highly crystalline material in their final product but because Dr. Reddy's micronizes that product it is not easy to detect that crystallinity. They actually mask the crystallinity in their process. That is why we sought a product un-micronized which we believe they have that they refuse to give us. Now, the court limited us to a theory, to defendant's theory that all we had to do is look at this final product and mind you the final product that they gave us was not testified to by any competent witness. There's no evidence that this product is representative of what they sell. You all tested that product that they gave you and all that you gave to the district court judge was we need more, this is inconclusive. Actually, that's not all we gave to the district court. If you look at the record, if you look at, I believe it's A907 to 909 in the appendix and I believe at about A1418 the declaration from our expert Dr. Luck. We explain in detail why the evidence that we have is not sufficient and why if we got additional evidence we believe that we would be able to prove that the product that DRL intends to sell would actually have the crystallinity claimed in our patents. For example, Dr. Luck explains that the data, the very scanned data that we were given from DRL, the x-ray diffraction data, evidences that this is a product that actually is crystalline but has been micronized to mask the crystalline character. It's not amorphous, as Dr. Reddy says, it's likely a crystalline product. How close do you think is Dr. Reddy's to having an ANDA approved? We have no idea. Again, we never got a discovery schedule entered. We never did get this discovery. I'm sorry, counsel, I thought the ANDA was approved and the product's already on the market. We don't, from my knowledge, the product is not on the market as of today. We got no discovery from DRL apart from the very limited sections of the ANDA that the court ordered that they give us. If you lose here and they are ready, it goes on the market, you can analyze it fast and if it has greater than 70% crystallinity, you're back in court again. Yes or no? The court dismissed our complaint with prejudice. Yes, we may have new facts. You may have new facts, product on the market, clear data. But again, it is our theory that what we need is discovery to develop those facts. Again, the character of the product may not be easily identifiable in final formulation. From a technical standpoint, I'm not following you. You're saying at some intermediate stage it might be 70% or more crystalline and that the final product is not or at least can't be detected using the x-ray powder detection method. But the claim is limited to something with 70% crystallinity detected by this method. What method is it you're going to use to ascertain 70% crystallinity in their product if not that method? I totally understand that line of argument and frankly I think that's line of argument fostered by DRL is where the court went awry. Now, the claims clearly require a 70% crystalline material and it says that that is determined by x-ray diffraction. If you look at the patent, the patents always measure crystallinity at the end of the manufacturing process which ends, as disclosed in the patent, which ends with the crystallization and drying step. Now, what DRL does, and we believe if we got the sample at the end of that step, tested it by x-ray diffraction, we would be able to prove that that material is crystalline. Now, what happens in the ordinary course of pharmaceutical manufacture after that? That material is crystalline. Now, that doesn't mean that that material in that final formulation is no longer crystalline. It still is, but however, it may not be as easy to determine in that final formulation the crystalline nature of that material. But you have a claim limitation and your claim limitation is 70% crystalline detected by this method. Absolutely, and we think we could argue and prove infringement by simply saying that the material that they put in their formulation is 70% crystalline and although you might not be able to detect it in the final formulation by that method, it remains 70% crystalline in the formulation. And we believe that that was the only evidence in the case that Whether it remains 70% crystalline or not, if it can't be detected by the method that you included specifically as a claim limitation during the prosecution of this case or this patent, I'm sort of I don't understand. You're missing a claim limitation. If you can't prove 70% detection using the x-ray powder diffraction method, then you can't satisfy the claims. End of story. So whether you could maybe come up with a different way of establishing 70% crystallinity isn't the question. Well, obviously that issue was never addressed and decided by the court and we believe that we would have satisfied that limitation by just the evidence that I put forward. Clearly, if the only evidence in the record was that we had tested their material, this is just the way it's done in the patent application. We're not asking anything to do anything esoteric different than what's described in the patent. The 960 patent covers a formulation including this 70% crystalline material. The patent says you make the crystalline magnesium product. You test it. That's what 70% crystalline. You mix that with the other materials to make the formulation and that's the final formulation. It's a formulation comprising a composition that is 70% crystalline and other materials. Now, one way to prove infringement would be to measure the final product and show that that material is in there, but we also believe that another way to prove infringement is to use the crystallinity method set out in the claims and it's proven by what we would believe is the preponderance of the evidence that that material has the requisite claim, meets the requisite claim limitations. But the process claim requires adding water. We're not talking about the process claim. I'm talking about the product claim. I thought a second ago, maybe I misunderstood you or maybe you misspoke, but a second ago you just said using the patented method and patented process and so I thought you were trying to reallege the process claims despite the absence of water. I'm happy to talk about that and well, there is water in the process. There is water in the process. They don't add the water. That's the claim construction. Mr. Taylor, you wanted to save and while I don't see a lot of yellow light on, I just wanted to let you know that what I thought you wanted to save, you're not using. Up to you. I do want to make one point before I sit down and then I'll reserve the rest of my time for rebuttal. Ms. Smith, should his yellow light be on? Yes. Okay, thank you. Now, what happened here in our view, in AstraZeneca's view, is that we were denied any kind of discovery on our theory of the case. If you look at this record, you'll find that there is no competent evidence in the record on the crystallinity of their product. Well, I think you're repeating yourself. Did you want to deal with the addition of water? Is that why you wanted to continue? Actually, I didn't. I'm happy to deal with that. I think the decision should be vacated and we can come back on the issue of water. But I think there's a fundamental issue here with regard to the process that the court undertook that I don't want to go unstated. Now, this is a Hatch-Waxman case and it starts with an imbalance in discovery. All of the facts regarding the infringing product is within the control of the accused infringer. Now, if we endorse the procedure where we rush to summary judgment without giving the patent owner an opportunity to get the basic discovery, test results on their infringing product, samples of the infringing product, a deposition of the declarant who made the summary judgment, who submitted evidence with their summary judgment, and the court grants summary judgment on that record. I think that the opportunity for mischief and error is so great that I ask that this court not endorse such a procedure. Thank you. Thank you, Mr. Taylor. We'll save a little more than a minute for you. Mr. Weinstein. If it pleases the court, the first thing is that DRL did give to Astra a sample of the finished product that was in a bottle and a sample of the salt that is used to make the finished product. Well, there are various batches of salt. I'm curious, did you give them samples of various batches or just the one that was used to make that finished product that you gave them? We gave them one sample of the salt. It's the one we had on hand and it is described at A1049 and I do not know if that was the sample of the salt that went into the bottle. However, that's really not relevant because their experts don't even address what happens when you get from the salt into the formulated product. Suppose that you had a product that was absolutely 70% crystalline, could be detected using the x-ray powder diffraction method. I hope I'm saying all that right. And then you added alcohol, grinded it up, did a bunch of other stuff and changed it so that the final sale ready product didn't appear to be 70% crystalline, but at an intermediate stage, it was absolutely exactly the claimed product. What should happen then? No infringement. Why? Aren't you making the infringing product? No. And using it? No, sir. Isn't that using it to make the final product? If the intermediate was 100% crystalline, but when it's imported, it is not 70% crystalline, no infringement. In order to infringe a product claim. Counsel, there are tons and tons of gene patents out there or chemical compound patents out there and people use that as a starting material and then they tweak the compound to make it something slightly different, but it's nonetheless using as the starting material, the very patented invention. Shouldn't there be compensation under circumstances like that? In some cases, yes. In this case, absolutely not. If you start with 100% crystalline material and then there is no dispute, DRL then puts that into a soup of methanol and methylene chloride, which is a much stronger solvent than just alcohol. And then that soup is sprayed onto the sugar spheres. That's all done overseas. Now you have to look at those sugar spheres. If there are not 70% crystalline material in those sugar spheres or in the final product, no infringement, even if you started with 100% material. You mean outside the country? Correct. The process... Okay, so your argument, just so I'm making sure I understand it, isn't that using someone else's patented product as your starting point doesn't ever amount to infringement. Your argument is that in this case, even if we're using the patented product, we're doing it somewhere outside the bounds of the United States and what is coming into the U.S. is absolutely not infringing. Correct. I understand now. And the district court understood this and recognized that ASTRA's world-class experts never addressed a single particular of the process that DRL uses to make its finished product, starting with the salt in bulk, then being put into this soup and then spray dried in flash evaporation onto spheres. Those details were given to their experts and they had them for months and months and months before they had to respond to summary judgment. Is it correct that the product is not yet on the market? The product is not yet on the market, but we have received final approval and the only thing that is keeping a generic version is this case, and the judge recognized that. And if we should find for you and the product goes on the market in a week or a month or two months and your product is determinable by X-ray diffraction methods as having 70% or more, you get sued again. I'm sure we would get sued again. I can't tell you what the result of that would be, but I think we would win that case too. Sounds like you think it's close. Not close at all. There were no crystals. There's a particular problem, isn't there, with an ANDA because by definition the product isn't on the market when the suit is brought under Hatch-Waxman. And so the patentee can't just go out and buy the product and test it. So they've got a particular need to get good discovery from you. To get good discovery? Yes. How is this normally done with an ANDA? The other side gets what they got here. They get the relevant portions of the ANDA and they get a sample, in this case of the finished product, which is exactly what they got. And you're saying what they got was what was submitted to the FDA and hence presumably what will end up as the marketed product. Correct. Now if, for example, their expert tested the batch that you gave them. Which batch? I'm sorry, the salt or the finished product? Aster is very slippery. Say they tested the finished product and discovered it was 68% crystalline. Now they've also, based on your data, been able to show that you had various batches and that the concentration of water differed in those batches and it just so happens that the concentration of the one you gave them was the lowest amount of water and that people know water and crystallinity are correlated. Wouldn't that be a different circumstance? Because it seems to me then we might actually have an abuse of discretion for denying discovery because their expert would allege a really good reason why the one batch you gave them is likely not representative but that other batches may well lead to an infringement proof. That would be a different case. It's not the case here. In fact, it was 68% material in the prior art and they distinguished that by saying it was 70%. But more than that, just because the salt may have had a certain amount of water in it, after it is put into the methanol methylene chloride soup and then there was no testimony in the record about the water content in the finished product even though they had the finished product to test. Can I ask you one other question about why you're not on the market? I'm not trying to get into business strategy. This is, in my mind, a legal question. You don't need, do you, to wait for an appeal to be resolved? Are you just being prudent or am I unaware of one of the rules, which may be entirely possible, with Hatch-Waxman that prevents you from going forward absent the appellate court's blessing? My understanding is it's a case of prudence. Okay, prudence. So it's not the case that our decision is obstructing or the time it takes us to write an opinion would be obstructing your ability to go forward from a legal standpoint. I mean, you have to have a district court judgment, which you do. And that's all that's required, right? At that point, you can go forward. Don't they get 30 months? And if you go on the market sooner, aren't you liable for greater damages? I don't believe that is true. If there is no district court decision, at the end of 30 months, the stay at the FDA will run out automatically and there could be an application to extend that. So 30 months is met by a district court decision, 30 months or a court decision, whichever is earlier? The 30 months will be over. Or a favorable court decision. Either 30 months expires or there's a district court decision. In this case, this court understood the importance of getting it out and put together an expedited procedure in order to determine exactly the appropriate amount of initial discovery, which makes this very different from MetLife. This case is not MetropolitanLife. In MetropolitanLife, there was no adequate opportunity for initial discovery as conceded during oral argument. In this case, the district court exercised her discretion and determined what would be the appropriate amount of initial discovery. After that was completed, then DRL moved for summary judgment and asked for more discovery under Rule 56F on the last day when their opposition was due. Now, given that ASTRA failed to meet the Rule 56F standard in the Second Circuit, it was not an abuse of discretion to deny further discovery. And, in fact, in ASTRA's opening brief, they never even bothered to say what the standard for 56F is in the Second Circuit, how they met it, why it was an abuse of discretion. We believe that the issue of further discovery was waived. In this case, Dr. Reddy submitted a Rule 56 statement containing only a few paragraphs to explain why its product is not 70 percent crystalline and cited, as far as I can tell, only its interrogatory answers. Is that correct? That is correct. Does that comply with the Rule? Because the interrogatory answers were based on information and belief and would not amount to admissible evidence. I believe there's two questions. The answer is yes. And the reason why it is correct is DRL relied on the prong of Celotex and Novartis and Exogen, which says DRL has to point out the problems in the patentee's case. We did not prove at the district court, and we did not try to prove beyond clear and convincing evidence, any standard, that we didn't have 70 percent. What we said is, we have tests, we did our homework, we do not think there's any crystals in there, show us your case. And AstraZeneca is saying, we'd be happy to show you the case, but we didn't have the opportunity to conduct even moderate discovery because the limited discovery we were given was insufficient. Well, they're completely wrong, Your Honor. The district court considered that and determined and asked AstraZeneca, what discovery do you need in order to meet what is a relatively low burden on summary judgment? And AstraZeneca said what it wanted. The district court determined what was appropriate. Astra got samples, interrogatory answers, which are not normally given in the samples after manufacturing and before micronization. Right, but there's no reason why that would be important to this case, because what matters is what's imported into this country. And they never, ever addressed how and going forward. Well, Mr. Taylor argues that, well, if it's 70 percent crystal after it's manufactured, it's still going to be 70 percent crystal in its final imported form, it's just it's more difficult to test that because of these other processes that occur. I don't believe that's the argument. The argument is when it comes out of the thin film dryer to make the bulk product, maybe it's 70 percent, maybe. If it was, then it gets micronized, and they say they can't test it after the micronization. But that's not the end of the story. We don't import the micronized material. That micronized material is then put into methanol and methanol chloride, almost as if you take sugar or salt and put it into a drink, it dissolves, and then the solvent is evaporated to make it. What the crystalline structure of what goes into that soup is not the crystalline structure that comes out of it, and there was no structure, because DRL uses a flash evaporation process to make an amorphous material. That's why spray drying evaporation is used, because you take the soup, you spray it out, and it dries so quickly that there is no opportunity for crystals to form. That's why spray evaporation is used. Also, because that is a way of keeping crystals from forming. So even if there were 100 percent crystals in the bulk salt, that doesn't say anything about what's in the finished product, and the judge recognized that. The judge recognized ASTRA's experts do not address DRL's spray drying process, which they had for 10 months before responding to summary judgment. Any thought that there might be 70 percent crystals in the finished product is pure speculation. Thank you, Mr. Weinstein. Unless you have 15 seconds left, do you have another thought? Thank you, Your Honor. Mr. Taylor has about two minutes. Thank you, Your Honor. I heard some things from Mr. Weinstein that are simply not in the record. I ask you to really look at the record, because really the issue here is, on the record that was before the district court, were there issues of fact that were in dispute, which resolved in AstraZeneca's favor, could have led a trier of fact to find that this product infringes. What is it, though, that you say is not on the record that he's talking about? This whole theory about this methylene chloride and what happens during the manufacturing process. I'd invite you to look at the record and find where that is. Frankly, that dispute is clearly an issue of fact, because we dispute that those processes would change the crystalline character of the material in such a way to defeat its crystallinity. What about the importing? Is it in the record that the only thing they're importing is the finished product? That is what I believe that is in the record, but that is not disputed that what is imported, I believe from the portions of the ANDA that we have seen, is the finished product. But we're entitled to prove infringement under 271G. If you infringe a patent overseas and you import the finished product here without materially changing it, you still infringe. So you don't get a pass necessarily. Only a process patent. A process patent. And you don't get a pass necessarily because you choose to use your infringing process overseas. So we were entitled to discovery on their process, and the intermediates, et cetera, that we sought just for that purpose. Now, what we've heard in a lot of the discussions... Just one more thought, Mr. Taylor. Your time is up, so one more thought. Thank you. My last thought is what we've heard are generalities and some statements about what is in and not in the record. I really do invite the court to look closely at the record, look closely at the evidence that AstraZeneca submitted in opposition to the motion. None of it was addressed by the district court in her decision. And in light of those submissions and the status of discovery in the case, I ask the court to find that the decision below must be vacated. Thank you. Thank you, Mr. Taylor. Let me place you to take another advisement. All rise.